IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| CARLOS RAY KIDD #1079464 | § | |
| v. | § | CIVIL ACTION NO. 9:11cv18 |
| RICK THALER, ET AL. | § | |

### MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND ENTERING FINAL JUDGMENT

The Plaintiff Carlos Ray Kidd, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. This Court ordered that the case be referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

Kidd says as background to his claim that in 2003, he was sexually assaulted by a TDCJ officer named James Larsen. He reported the incident and Larsen was fired and criminally prosecuted.

However, Kidd says, Larsen was "highly valued" by the prison gang known as the Aryan Brotherhood because he brought in contraband such as case, drugs, cell phones, tobacco, and weapons for the gang. When Kidd's complaint had Larsen terminated, Kidd became a "marked man." He says that he has been harassed, threatened, assaulted, and extorted by the gang, and that he has been "labeled as a snitch," causing him to endure abuse from both inmates and staff.

In 2004, Kidd says that he was sexually assaulted and beaten unconscious while in administrative segregation. He contacted the ACLU, which has contacted Texas prison officials on Kidd's behalf. Because moving Kidd around, from cell to cell, from wing to wing, and from unit

1

to unit has not alleviated the problem, Kidd says that the ACLU asked that he be transferred to another state or into federal custody, but this has not happened.

Kidd was transferred to the Ramsey I Unit, which has a protective custody section, but even here, he began to suffer harassment, abuse and threats; he states that he received a note, purportedly from the Aryan Brotherhood, threatening to kill him. Kidd says that one inmate tried to shoot him with a spear and another tried to push a bare electrical cord into the shower while Kidd was there. He again contacted the ACLU, which sought a higher level of protection for him, but to no avail. As a result of this danger, Kidd says that he escaped from a medical transport in 2005 in order to preserve his own life.

During the course of this escape, Kidd says that he was out for less than 24 hours before being recaptured. After his recapture, however, instead of increasing his protection level, the Director of TDCJ and the State Classification Committee decreased his protection level by placing him back into administrative segregation - security detention, rather than protective custody.

Kidd concedes that he has been transferred to 15 different prisons around the state, but says that the abuse and threats follow him wherever he goes. He complains that the defendants will not use "the tools at their disposal" to ensure his safety, including a transfer to another state or to federal custody, or even back to administrative segregation - protective custody.

All of the above is background to the claims in the present case. The claims in the current lawsuit begin in January of 2010, when Kidd met with Ralph Bales, the Prison Rape Elimination Act ombudsman from the Texas Board of Criminal Justice. Kidd had just arrived at the Gib Lewis Unit, but was already being harassed, threatened, and called a snitch. He gave Bales a note, purportedly from a former Aryan Brotherhood member, saying that the Brotherhood intended to kill him, and a purported note from a former Aryan Circle gang member saying that the writer had witnessed members of the Aryan Brotherhood plotting to kill him. Bales made copies of the notes and returned them to Kidd.

2

Kidd says that Bales promised to discuss the matter with prison officials, but that a month or so later, a staff psychologist contacted Bales, who said that Kidd would not be transferred to another state or to federal prison, or into protective custody.

One of the notes was found in Kidd's cell and confiscated by guards. He asked Warden Ginsel about it and expressed fears for his safety, and Ginsel told him to send in a request form asking for the note. Kidd filed a grievance, but nothing was done to assure his safety.

On May 10, 2010, Kidd was assaulted by an Aryan Brotherhood member named Shirley, who used a home-made slingshot to shoot Kidd in the face with pieces of metal. Kidd stated that he had opened the food slot door of his cell to get the attention of officers when Shirley, who was in his own cell, shot him. The wing officer called Lt. Adcock, who did not take Kidd to the infirmary but just told him to wash off his face. Kidd did not do so, wanting his injury to be seen and treated.

After shift change, Kidd was taken to the infirmary, where a nurse washed his face but took no other action, and made no notation of the wound. Three days later, he saw a doctor, who documented the injury and gave him ibuprofen for pain.

Despite this, Kidd says that he was forced to live in close proximity to Shirley for another three weeks, although Shirley was gone from the unit during one of these weeks. Kidd contacted an outside group called Just Detention International and they pressured the prison officials into moving Kidd to another wing, but this did not resolve the problem, which simply persisted on the next wing where he was moved.

On July 22, 2010, Kidd had a hearing in another lawsuit which he had filed in this Court. Kidd v. Perry, et al., civil action no. 9:10cv57 (E.D.Tex.). He had filed this lawsuit prior to the May 10 assault but discussed that incident at the evidentiary hearing. Warden Motal, a TDCJ official, testified that Kidd was being provided with the highest level of protection available, but Kidd said that the warden contradicted himself by saying that Kidd was eligible for placement in protective custody, although the State Classification Committee would have to make that change.

Kidd says that he is also harassed by security staff. He asserts that his cell is searched every day and his legal papers routinely scattered around. The security staff requires him to undergo strip searches even though they know that he was a sexual assault victim. Officers Garcia and Jackson have verbally harassed him during strip searches and have made him stand naked on the run in front of other inmates, who harassed him.

On October 29, 2010, Kidd says that a cell search was done by a riot team. Kidd was handcuffed, but the handcuffs malfunctioned and had to be cut off. His feet were shackled so tightly he could not walk. Kidd says that he was picked up and carried into the cell, and his head "rammed" into a corner of the bunk. He was then slammed and the floor and punched in the face. After the restraints were removed, Kidd saw that he had sustained injuries and asked for medical care, but the sergeant refused.

On October 31, 2010, Kidd says that he was finally taken to the medical department. His injuries were documented as bruises and a contusion, but the medical records state that Kidd did not report these injuries to security.

Kidd filed grievances about the assault, but says that these only resulted in more retaliation. On December 25, Lt. Vincent, Sgt. Butler, and a five-man riot team woke Kidd up, entered his cell, and confiscated pens, soap, combs, his mattress, and a box containing over 2000 documents, which were disclosure items sent to him in another lawsuit. He asked Vincent why this was being done and Vincent said "because I can." Kidd received no confiscation papers for his property.

On December 29, Kidd says that he spoke to Lynn Sharpe from the Safe Prisons Program. He told her about the abuse, but she said that there was nothing she could do, stating that Kidd had already been transferred all over the state to many different prisons. Sharpe said that even if Kidd were transferred, the problem "seems like it will persist." Sharpe added that TDCJ Director Brad Livingston had assigned Kidd to the Gib Lewis Unit and so unless a transfer was ordered, Kidd was stuck there and would have to make the best of a bad situation.

When Kidd asked Sharpe about being transferred back to protective custody, she said that this was not possible because of the 2005 escape. She also told Kidd that the State of Texas would not transfer him to another state or into federal custody. Kidd contends that the prison officials are "largely ignoring" his need for protection and are forcing him to live in a dangerous environment. He asks for monetary damages and a transfer to an institution outside of TDCJ where his safety can be assured.

In reviewing Kidd's lawsuit, the Magistrate Judge first took note of Kidd's litigation history. On April 22, 2010, Kidd filed the lawsuit referenced above, Kidd v. Perry. An evidentiary hearing was conducted and the lawsuit was dismissed as frivolous on July 23, 2010. No appeal was taken.

On August 31, 2009, Kidd filed a lawsuit in the U.S. District Court for the District of Columbia, complaining of a First Amendment violation in that U.S. currency bears the inscription "In God We Trust." This lawsuit was dismissed for failure to state a claim upon which relief could be granted on October 26, 2009. Kidd appealed to the District of Columbia Circuit, which affirmed the dismissal in an unpublished order dated July 21, 2010.

On June 23, 2008, Kidd filed a lawsuit in the Eastern District of Texas complaining of the conditions of confinement at the Michael Unit. The Defendants were ordered to answer this lawsuit and filed a motion to dismiss arguing that Kidd had failed to state a claim upon which relief could be granted because he had failed to exhaust his administrative remedies. This motion was granted and the lawsuit was dismissed on February 4, 2009. No appeal was taken. '

After reviewing these cases, the Magistrate Judge issued a Report on August 26, 2011, recommending that the lawsuit be dismissed. The Magistrate Judge concluded that these three dismissals amounted to three strikes within the meaning of 28 U.S.C. §1915(g), which provides that

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the ground that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

After discussing the validity and scope of Section 1915(g), the Magistrate Judge observed that all of Kidd's strikes became final prior to the filing of the present lawsuit and noted that Kidd did not pay the filing fee of $350.00.

With regard to a possible showing of imminent danger, the Magistrate Judge said that the threat must be "real and proximate," and that allegations of past harm do not suffice; the harm must be imminent or occurring at the time that the lawsuit is filed, and the exception refers to "a genuine emergency where time is pressing." In this case, a number of the specific incidents to which Kidd referred had happened in the past, and thus did not support a finding that he is in imminent danger as of the time of the filing of the lawsuit.

The Magistrate Judge referred to King v. Livingston, civil action no. 3:05cv464 (S.D.Tex., September 8, 2005), in which the plaintiff Gerald King alleged that his complaints against prison officials through grievances and lawsuits had brought him "threats of bodily harm, making sure I don't make parole, and threats I would never leave the Texas prison system." He stated that "these threats have been carried out through physical assaults by the Defendants, bogus and retaliatory disciplinary cases, major and minor tampering and denial of medical treatment and restrictions, and denials and delays of chronic prescribed medications as a plot to medically induce my death." He mentioned an assault which had occurred two months before the filing of the complaint and said that his asthma inhaler had been changed from a 30 day renewal to a 90 day renewal so that he would be without it for 60 days, to "medically induce my death."

Although King asserted that he was in imminent danger, the Southern District disagreed, stating that King had three strikes and that "a review of the complaint fails to prove that King is in imminent danger of serious physical injury." On appeal, the Fifth Circuit stated as follows:

> King argues that he is in imminent danger of serious physical injury because he has been assaulted several times by the defendants and other inmates and because the defendants have attempted to cause him serious physical injury from the time of Hurricane Rita to the present. King fails to meet the showing required to avoid application of the three strikes bar under 28 U.S.C. §1915(g). See Baños v. O'Guin, 144 F.3d 883, 884-85 (5th Cir. 1998).

6

In the present case, the Magistrate Judge said that Kidd's claim of on-going "imminent danger" as a result of the failure to protect him in the way that he believes appropriate is essentially the same claim that he raised in Kidd v. Perry, which lawsuit was dismissed as frivolous. In that case, Kidd discussed the sexual assault by Larsen in 2003 and his transfer to the Gib Lewis Unit, where the incidents in that lawsuit as well as the present one took place. Kidd testified that at the Gib Lewis Unit, he is confined in a single man cell in administrative segregation and is escorted by officers every time he leaves his cell, as are all other inmates housed in that area. He also acknowledged that the prison officials were responsive to his concerns, repeatedly moving him to different areas within the prison and to different prisons within the state. The Court concluded that Kidd is being provided the highest level of protection available in the prison system and concluded that his claim of deliberate indifference to his safety was frivolous.

The Magistrate Judge stated in the present case that Kidd offered nothing to show that his situation had changed in any meaningful way between the filing of the previous case and the filing of the present one. Kidd concedes that he has been housed at all times in administrative segregation, which includes being housed in a cell by himself and escorts by officers whenever he leaves his cell. The Magistrate Judge cited Gamer v. Martinez, civil action no. 2:06cv266, 2005 WL 2206203 (S.D.Tex., September 12, 2005, *Report adopted and case dismissed* November 12, 2005, *appeal dismissed*), in which the U.S. District Court for the Southern District of Texas noted that "even if the plaintiff could establish that his life was in danger, his placement in administrative segregation, where he is confined to a cell 23 hours a day, is perhaps the safest housing assignment at the unit." The Magistrate Judge stated that the security measures under which Kidd was confined when this lawsuit was filed were sufficient to show that any danger which he may face is not "imminent" within the meaning of the statute.

The Magistrate Judge cited a concurring opinion by Justice Thomas noting that "prisons are necessarily dangerous places," *see* Farmer v. Brennan, 114 S.Ct. 1970, 1990 (1994) (Thomas, J., concurring in the judgment). The fact that prisons are dangerous places does not thereby render all

prisoners, at all times, in "imminent danger of serious physical injury;" rather, some more concrete showing must be made by an inmate who is subject to the Section 1915(g) bar. Because Kidd did not make such a showing, nor did he pay the full filing fee, the Magistrate Judge recommended that the lawsuit be dismissed with prejudice as to the refiling of another *in forma pauperis* lawsuit raising these same claims, but without prejudice as to Kidd's right to refile the lawsuit without seeking *in forma pauperis* and upon payment of the full filing fee. The Magistrate Judge also recommended that should Kidd pay the full filing fee within 15 days after dismissal of the lawsuit, he should be allowed to proceed as though the full fee were paid from the outset.

Kidd filed objections to the Report on September 6, 2011, in the form of a "motion for *de novo* review." In this motion, he says that the Magistrate Judge claimed that he had abused the *in forma pauperis* procedures, but that in fact, he is not a lawyer and has filed several *in forma pauperis* lawsuits which he believed were meritorious, but which he did not know how to formulate because of his lack of legal training.

Kidd says that if an attorney had filed his lawsuits, and done it professionally, the complaints would have been moved forward, but because of his lack of legal expertise, they get dismissed "for one reason or another." With regard to the imminent danger exception, Kidd asks that the Court hold a trial so that he can prove the elements of danger to his safety. He says that he will need access to the Court's law library for six months to a year before such a trial can be held, so that he can give himself some legal training. He says that once he is "transformed into an attorney," with the help of the Court, his pleadings will no longer be fruitless as they have been in the past.

However, Kidd says, the Court may not "convert" him into an attorney, meaning that in the future, he will not be respected by the Court, but regarded as "a low life inmate in a filthy prison, and of no real concern to a federal judge in his or her courtroom, where Plaintiff can easily be dismissed and disposed of as frivolous or failure to state a claim excuses." He claims that whether or not his life is in danger is "of no real concern" to a judge who has immunity.

If the Court grants him relief against TDCJ, Kidd says, then TDCJ will "get mad at the Court," which could have "a powerful fall back on the court some way or another, so I really don't expect the court to do anything for me." He suggests that "if the court pisses TDCJ off then they may even lock up the judges and have officers to rape them, so we don't want that do we?" He says that it is easy to write threatening letters to federal judges without any substance behind them, as he has done in the past, but that it is "impossible" to get an injunction to be protected. Specifically, Kidd states as follows:

> It's easy to threaten to KILL federal judges as I have done before, with no real substance to the threat, but as a ploy to get a federal charge placed on me so I will be removed from TDCJ to face the federal charge. Writing a letter threatening to kill a federal judge is more like a motion for injunction than anything else to me. It gets me some temporary relief, and more prison time, but oh well, it gets me away from the danger I face in TDCJ for a little while.

> So you may get a threatening letter from me before too long, and I'd appreciate for you to file charges on me so I will be sent to the federal system for a year or two, at least that will buy me a little time, and afford me the opportunity to come out of my cell to shower, and have some recreation with [sic] the ever present threat of assault or death. I may end up with a life sentence for those threat letters, but in my desperation, I really have no other way. I could maybe escape again, but I have nowhere to go on the streets, plus if I do that again to even protect my life, I'll get more time in TDCJ where I'm already in danger, so that would be counter-productive.

Kidd goes on to state that it is "useless" to list the grounds upon which the Magistrate Judge's decision should be overturned because the Court will adopt the Magistrate Judge's opinion in any event. He again asks that charges be filed upon him if he sends a threatening letter.

Next, Kidd says that he has been swallowing razor blades and "sticking razor blades in his penis," sometimes because he is suicidal because of his situation, and sometimes just to try to "end it all." But usually he does this because he is "desperate to get away from the people who are trying to cause me harm." He says that these actions get him away from the danger, though only temporarily. Kidd then says that he really does not want to kill himself but that he may end up with this being the only option. Kidd concludes by again asking that charges be filed on him if he writes a threatening letter, saying that if this is not done, he will "figure out some other desperate act to perform to get myself into a safer situation."

Kidd did not object to the Magistrate Judge's conclusion that he has three strikes, nor did he raise any specific objections to the Magistrate Judge's conclusion that he was not in imminent danger of serious physical injury because of his housing status. Accordingly, Kidd is barred, except upon grounds of plain error, from appellate review of those proposed factual findings and legal conclusions, which have been accepted and adopted by the district court. Douglass v. United Services Automobile Association, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).[1]

The Court has conducted a careful *de novo* review of the pleadings and testimony in this case, including the Report of the Magistrate Judge and the Plaintiff's objections thereto. Upon such *de novo* review, the Court has concluded that the Report of the Magistrate Judge is correct and that the Plaintiff's objections are without merit. It is accordingly

ORDERED that the Plaintiff's objections are overruled and the Report of the Magistrate Judge (docket no. 33) is hereby ADOPTED in its entirety as the opinion of the District Court. It is further

ORDERED that the Plaintiff Carlos Kidd's leave to proceed *in forma pauperis* is hereby REVOKED. It is further

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as to the refiling of another *in forma pauperis* lawsuit raising the same claims as herein presented, but without prejudice to the refiling of this lawsuit without seeking *in forma pauperis* status and upon payment of the statutory $350.00 filing fee. It is further

ORDERED that should the Plaintiff pay the full filing fee within 15 days after the date of entry of final judgment in this case, he shall be allowed to proceed in the lawsuit as through the full fee had been paid from the outset. Finally, it is

---

[1] Plain error is "error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of the judicial proceedings and would result in manifest injustice." Garriott v. NCSoft Corp., — F.3d —, 2011 WL 5009950 (5th Cir., October 21, 2011) (not yet published).

ORDERED that any and all motions which may be pending in this action are hereby DENIED.

So **ORDERED** and **SIGNED** this **21** day of **December, 2011.**

_____
Ron Clark, United States District Judge